# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 14, 2017     Decided February 16, 2018

No. 15-1115

SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY, ET AL.,
RESPONDENTS

NATIONAL ENVIRONMENTAL DEVELOPMENT ASSOCIATION'S
CLEAN AIR PROJECT, ET AL.,
INTERVENORS

———

Consolidated with 15-1123

———

On Petitions for Review of a Final Action
of the Environmental Protection Agency

———

*Megan E. Lorenz Angarita* argued the cause for petitioner
South Coast Air Quality Management District. With her on the
briefs were *Kurt R. Wiese* and *Barbara Baird*.

*Seth L. Johnson* argued the cause for Environmental Petitioners. With him on the briefs was *David S. Baron*.

*Kelvin J. Dowd* and *Andrew B. Kolesar III* were on the brief for *amicus curiae* Ventura County Air Pollution Control District in support of petitioner South Coast Air Quality Management District.

*Heather E. Gange*, Trial Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the brief was *John C. Cruden*, Assistant Attorney General at the time the brief was filed.

*Seth L. Johnson* argued the cause for Environmental Movant-Intervenors. With him on the brief was *David S. Baron*.

*Megan E. Lorenz Angarita*, *Kurt R. Wiese*, and *Barbara Baird* were on the brief for *amicus curiae* South Coast Air Quality Management District in support of respondent's opposition to Sierra Club's argument regarding reasonably available control technology in Case No. 15-1123.

*Leslie Sue Ritts* was on the brief for intervenor for respondent National Environmental Development Association's Clean Air Project in support of U.S. Environmental Protection Agency.

Before: GARLAND, *Chief Judge*, ROGERS, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: In this consolidated proceeding, we consider petitions for review of an Environmental Protection Agency ("EPA") final rule entitled "Implementation of the 2008 National Ambient Air Quality Standards for Ozone: State Implementation Plan Review Requirements," 80 Fed. Reg. 12,264 (Mar. 6, 2015). In Case No. 15-1115, petitioner South Coast Air Quality Management District ("South Coast") contends that the EPA incorrectly concluded that precedent of this Court requires emissions reductions that demonstrate reasonable further progress all come from within the nonattainment area. In Case No. 15-1123, petitioners Sierra Club, Conservation Law Foundation, Downwinders at Risk, and Physicians for Social Responsibility (Los Angeles) ("Environmental Petitioners") contend that in enacting the Final Rule, the EPA acted arbitrarily and capriciously in its revocation of 1997 National Ambient Air Quality Standards and relaxation of previously applicable requirements under the Clean Air Act.

For the reasons stated below, we deny South Coast's petition for review, and grant in part and deny in part that of the Environmental Petitioners.

## I. BACKGROUND

### A. The Clean Air Act Framework

The Clean Air Act ("CAA" or "Act") directs the EPA to set National Ambient Air Quality Standards ("NAAQS") for air pollutants "allowing an adequate margin of safety . . . requisite to protect the public health." 42 U.S.C. § 7409(b)(1). The CAA also requires the EPA to establish air quality control regions and designate them as "attainment" for "any area . . . that meets" the NAAQS, "nonattainment" for "any area that does not meet" the NAAQS, and "unclassifiable" for "any area

that cannot be classified on the basis of available information." § 7407(d)(1)(A).

The EPA must classify each area "designated nonattainment for ozone" as "marginal," "moderate," "serious," "severe," or "extreme" based on the degree to which the ozone level in the area exceeds the NAAQS. § 7511. "An area that exceeds the NAAQS by a greater margin is given more time to meet the standard but is subjected to progressively more stringent emissions controls for ozone precursors, namely, volatile organic compounds (VOCs) and oxides of nitrogen ($NO_x$)." *Natural Res. Def. Council v. EPA* (*NRDC 2009*), 571 F.3d 1245, 1250 (D.C. Cir. 2009).

The Act places on the states "the primary responsibility for assuring air quality" by submitting state implementation plans ("SIPs") that specify how they will achieve and maintain compliance with the NAAQS. 42 U.S.C. § 7407(a). States must formally adopt SIPs through state notice and comment rulemaking and then submit the SIPs to the EPA for approval. § 7410(a). For those areas designated as "nonattainment," SIPs must show how the areas will achieve and maintain the relevant NAAQS. *Id.*

A nonattainment area may be redesignated to attainment if the EPA (1) has determined that the area has attained the applicable NAAQS; (2) has fully approved the applicable SIP under § 7410(k); (3) has determined that the attainment is due to permanent and enforceable emissions reductions; (4) has fully approved a § 7505a "maintenance plan," which demonstrates that the area will maintain the NAAQS for at least 10 years after the redesignation, *see* § 7505a(a); and (5) has determined that the state containing the area seeking redesignation has met all applicable SIP requirements.

§ 7407(d)(3)(E). Areas redesignated as attainment are referred to as "maintenance areas."

## B. SIPs for Nonattainment Areas

As is relevant to this case, the Clean Air Act requires SIPs for nonattainment areas to include the following provisions:

### 1. Reasonable Further Progress

SIPs for nonattainment areas "shall require reasonable further progress." § 7502(c)(2). "Reasonable further progress" is defined as "such annual incremental reductions in emissions of the relevant air pollutants as are required by this part or may reasonably be required by [the EPA] for the purpose of ensuring attainment of the applicable [NAAQS] by the applicable date." § 7501(1). The Clean Air Act requires an area in a moderate or greater degree of nonattainment to reduce emissions of VOCs by fifteen percent in the first six years after November 15, 1990. § 7511a(b)(1)(A). For areas in a serious or greater degree of nonattainment, subsequent reductions in VOC emissions must average three percent per year over each consecutive three-year period until the area reaches attainment. § 7511a(c)(2)(B).

### 2. Reasonably Available Control Technology

SIPs for ozone nonattainment areas must also "provide for the implementation of all reasonably available control measures as expeditiously as practicable (including such reductions in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology)." § 7502(c)(1). For nonattainment areas classified as moderate and above, SIPs

must "require the implementation of reasonably available control technology" with respect to all major sources of VOCs in the area and any sources that emit VOCs in the area that are covered by a control technique guideline. § 7511a(b)(2). The reasonably available control technology requirement also applies to major sources of $NO_x$. § 7511a(f).

### 3. New Source Review

SIPs governing nonattainment areas must require permits for the construction of new or modified sources of air pollution. §§ 7502(c)(5), 7503, 7410(a)(2)(C). The goal of New Source Review is to require permits to ensure that new or modified sources will not exacerbate the pollution problem in the nonattainment area. § 7503(a)(1)(A), (a)(2), (c). New Source permits for major sources of VOCs require the proposed source (1) to comply with the lowest achievable emissions rate and (2) to obtain pollution offsets representing equal or greater reductions of a pollutant at issue in the area. *Id.*

### 4. Conformity

The Act mandates that nonattainment and maintenance areas are subject to "conformity requirements," so that "[n]o department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan." § 7506(c)(1), (5). Federally funded projects must "conform" to SIPs, meaning that the projects will not "cause or contribute to any new violation," "increase the frequency or severity of any existing violation," or "delay timely attainment of any standard or any required interim emission reductions or other milestones in any area." § 7506(c)(1)(B). These areas are also subject to the more specific transportation conformity

requirements, whereby federal agencies may not "approve, accept or fund any transportation plan, program or project unless" it conforms to an applicable SIP. § 7506(c)(2). With respect to transportation conformity requirements, the EPA is responsible for promulgating, and periodically updating, "criteria and procedures for demonstrating and assuring conformity in the case of transportation plans, programs, and projects." § 7506(c)(4)(B).

### 5.  Contingency Measures

SIPs must include contingency measures that take effect automatically "if the area fails to make reasonable further progress, or to attain the [NAAQS] by the attainment date." §§ 7502(c)(9), 7511a(c)(9).

### C.  Anti-Backsliding Measures for Revoked NAAQS

The Clean Air Act requires the EPA to "complete a thorough review" of each NAAQS every five years and "make such revisions . . . and promulgate such new standards as may be appropriate." § 7409(d)(1). In promulgating new standards, if the EPA relaxes a NAAQS, it shall promulgate anti-backsliding measures for all areas that have not attained that standard as of the date of the relaxation. § 7502(e). The anti-backsliding measures "shall provide for controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation." *Id.*

### D.  Ozone NAAQS

In 1979, the EPA promulgated the first ozone NAAQS based on a one-hour average concentration of 0.12 parts per million (ppm). Revisions to the NAAQS for Photochemical Oxidants, 44 Fed. Reg. 8202, 8202 (Feb. 8, 1979). In 1997,

after determining that the one-hour NAAQS was inadequate to protect public health, the EPA promulgated a new NAAQS based on an eight-hour average of 0.08 ppm. NAAQS for Ozone, 62 Fed. Reg. 38,856, 38,858 (July 18, 1997). Although the EPA replaced the one-hour NAAQS with an eight-hour NAAQS, it determined that it would continue to enforce the one-hour NAAQS until "an area has attained air quality that meets the 1-hour standard." Implementation of Revised Air Quality Standards for Ozone and Particulate Matter, 62 Fed. Reg. 38,421, 38,424 (July 18, 1997). In a 2004 rule, the EPA revoked the one-hour NAAQS effective June 15, 2005. Final Rule to Implement the 8-Hour Ozone NAAQS—Phase 1, 69 Fed. Reg. 23,951, 23,951 (Apr. 30, 2004). This Court held that the EPA has the "authority to revoke the one-hour standard so long as adequate anti-backsliding provisions are introduced." *South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 899 (D.C. Cir. 2006), *clarified on denial of reh'g*, 489 F.3d 1245 (D.C. Cir. 2007).

In 2008, the EPA determined that the 1997 NAAQS was inadequate to protect public health. The EPA therefore promulgated a new NAAQS of 0.075 ppm of ozone averaged over eight hours. NAAQS for Ozone, 73 Fed. Reg. 16,436, 16,436 (Mar. 27, 2008). "The 2008 ozone NAAQS retains the same general form and averaging time as the 0.08 ppm NAAQS set in 1997, but is set at a more stringent level." Implementation of the 2008 NAAQS for Ozone: State Implementation Plan Requirements, 80 Fed. Reg. 12,264, 12,265 (Mar. 6, 2015).

### E. The Final Rule

On March 6, 2015, the EPA finalized a rule that "revises existing regulations and guidance as appropriate to aid in the implementation of the 2008 ozone NAAQS." 80 Fed. Reg. at

12,265.  As part of the Final Rule, the EPA revoked the 1997 NAAQS "for all purposes and establish[ed] anti-backsliding requirements for areas that remain designated nonattainment for the revoked NAAQS."  *Id.*

## II.    STANDARD OF REVIEW

We will not set aside EPA action under the Clean Air Act unless we determine that such action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  42 U.S.C. § 7607(d)(9)(A).  The EPA's interpretation of the Clean Air Act is reviewed under the familiar two-step framework of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), whereby we first look to the statute's language to determine if Congress has "directly spoken to the precise question at issue."  *Id.* at 842. If Congress has directly spoken to the precise question, then we must "give effect to the unambiguously expressed intent of Congress."  *Id.* at 843.  If, however, "the statute is silent or ambiguous with respect to the specific issue," we defer to the EPA's interpretation of the Act so long as it "is based on a permissible construction of the statute."  *Id.*

Under those standards, we review in turn the cross-petitions of South Coast and the Environmental Petitioners.

## III. SOUTH COAST'S PETITION

We begin with the simpler of the two petitions, that of South Coast.  South Coast petitions this Court to invalidate the EPA's interpretation of the CAA in the Final Rule that "states may not take credit for VOC or $NO_x$ reductions occurring from sources outside the nonattainment area for purposes of meeting the 15 percent [rate-of-progress] and 3 percent [reasonable further progress] requirements."  80 Fed. Reg. at 12,273.  South

Coast argues that the EPA was not required to interpret "in the area" in the context of the reasonable further progress requirement to mean "in the nonattainment area." *See* 42 U.S.C. § 7511a(b)(1)(B). In promulgating the Final Rule, the EPA explained that in light of this Court's decision in *NRDC 2009*, 571 F.3d at 1256, "there is no legal basis" for "allowing states to credit reductions achieved at sources outside the nonattainment area." 80 Fed. Reg. at 12,273. South Coast counters that our decision in *NRDC 2009* does not mandate the EPA's interpretation. Instead, South Coast contends that because downwind nonattainment areas are impacted by emissions from upwind areas, the EPA could reasonably interpret "in the area" in the context of the reasonable further progress requirement to mean the "transport couple area"—"a larger area consisting of the nonattainment area in question plus the upwind area from which emission reductions would be obtained."

The text here is unambiguous. The Clean Air Act requires nonattainment areas that are classified as moderate or above to plan for "reasonable further progress" measured from "baseline emissions," which are defined as "the total amount of actual VOC or $NO_x$ emissions from all anthropogenic sources in the area during the" baseline year. 42 U.S.C. § 7511a(b)(1)(A), (b)(1)(B), (c)(2)(B), (d), (e). These statutory provisions refer to only one area, "the area." Further, the term appears in a section entitled "Moderate Areas," not a greater area. § 7511a(b); *see also* § 7511(c)(1).

South Coast contends that limiting the phrase "in the area" to nonattainment areas would produce absurd results. According to South Coast, it may be impossible for certain areas to achieve the necessary emissions reductions. Where the purpose of the Clean Air Act is served by interpreting "in the

area" to mean "transport couple area," South Coast argues that the statutory language is ambiguous.

However, the Clean Air Act provides for an alternative to reducing emissions of pollutants by fixed percentages. § 7511a(b)(1)(A)(ii), (c)(2)(B). Nonattainment areas may reduce emissions by less than 15 percent if they (1) implement controls on a broader range of new and existing stationary sources and (2) include in their SIP "all measures that can feasibly be implemented in the area, in light of technological achievability" and "measures that are achieved in practice by sources in the same source category in nonattainment areas of the next higher category." § 7511a(b)(1)(A)(ii). Likewise, nonattainment areas may reduce emissions by less than three percent if the SIP "includes all measures that can feasibly be implemented in the area, in light of technological achievability" and "measures that are achieved in practice by sources in the same source category in nonattainment areas of the next higher classification." § 7511a(c)(2)(B)(ii). Moreover, states may also ask the EPA to approve new boundaries for air quality control regions. *See* 42 U.S.C. § 7407(b)-(c). In light of the alternatives provided for in the Clean Air Act, South Coast has failed to meet the "exceptionally high burden" required to demonstrate absurdity. *Friends of Earth, Inc. v. EPA*, 446 F.3d 140, 146 (D.C. Cir. 2006).

In sum, considering the grammar and context of § 7511a(b)(1)(B), we hold at *Chevron* step one that "in the area" unambiguously refers to baseline emissions within the nonattainment area. Accordingly, we deny South Coast's petition.

## IV. ENVIRONMENTAL PETITIONERS' PETITION

Environmental Petitioners petition this Court to vacate several parts of the Final Rule. We take each challenge in turn.

### A. Waiver of Statutory Attainment Deadlines Associated with the 1997 NAAQS

Environmental Petitioners seek to invalidate the Final Rule's revocation of the 1997 NAAQS. 80 Fed. Reg. at 12,296. They argue that by revoking the 1997 NAAQS, the Final Rule arbitrarily waives the obligation to attain the 1997 NAAQS by the statutory deadline. The EPA counters that the Clean Air Act authorizes revocation of a superseded NAAQS so long as adequate anti-backsliding measures are in place.

We have already held that the EPA may revoke a previous NAAQS in full "so long as adequate anti-backsliding provisions are introduced." *South Coast*, 472 F.3d at 899. But in the Final Rule, the EPA failed to introduce adequate anti-backsliding provisions.

Pursuant to the Clean Air Act, anti-backsliding provisions "shall provide for controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation." 42 U.S.C. § 7502(e). Penalties for not meeting attainment deadlines such as fees and activation of contingency measures are unambiguously "controls" because they are "designed to constrain ozone pollution." *South Coast*, 472 F.3d at 902-03. Likewise, reclassification is also a control because it is "designed to constrain ozone pollution." *See id.* Areas that fail to timely attain are required to reclassify and be subject to more stringent emissions controls. 42 U.S.C. §§ 7511(b)(2), 7511a(i). If the EPA were allowed to remove

the deadlines that trigger those penalties, "a state could go unpenalized without ever attaining" the NAAQS. *South Coast*, 472 F.3d at 902-03.

The Final Rule provides that "the EPA is required to determine whether an area attained the 1-hour or 1997 ozone NAAQS by the area's attainment date solely for anti-backsliding purposes to address an applicable requirement for nonattainment contingency measures and CAA section 185 fee programs." 80 Fed. Reg. at 12,315. But the Final Rule specifically waives the obligation "to reclassify an area to a higher classification for the 1997 ozone NAAQS" based on a failure to meet the 1997 NAAQS attainment deadlines. *Id.* As a result, the Final Rule allows areas that fail to timely attain to avoid being subject to more stringent emissions controls. Therefore, the Final Rule relaxed the controls applicable to areas designated nonattainment under the 1997 NAAQS in contravention of the anti-backsliding requirement. Accordingly, we grant this part of Environmental Petitioners' petition and vacate the Final Rule as to the waived statutory attainment deadlines associated with the 1997 NAAQS.

###### B.    Removal of Anti-Backsliding Requirements for Areas Designated Nonattainment Under the 1997 NAAQS

Environmental Petitioners also seek to invalidate other provisions of the Final Rule that they allege contravene the Clean Air Act's anti-backsliding requirements. The Final Rule provides for three procedures by which areas designated nonattainment under the 1997 NAAQS may remove certain anti-backsliding requirements and shift other requirements from the active portion of their SIPs to the contingency measures portion. 80 Fed. Reg. at 12,299-12,304.

### 1. Orphan Nonattainment Areas

The first procedure applies to areas designated attainment for the 2008 NAAQS, but nonattainment for the 1997 NAAQS. *Id.* at 12,301-12,302. Environmental Petitioners refer to these areas as "orphan nonattainment areas." For orphan nonattainment areas, "states are not required to adopt any outstanding applicable requirements for the revoked 1997 standard." *Id.* at 12,302. Under the Final Rule, orphan nonattainment areas "are not subject to transportation or general conformity requirements." *Id.* at 12,300. In addition, orphan nonattainment areas are no longer required to retain New Source Review programs in their SIPs. *Id.* at 12,299. Instead, these areas are subject to Prevention of Significant Deterioration ("PSD") requirements. *Id.* States may also request that other anti-backsliding requirements be shifted to their list of contingency measures based on initial 2008 designations. *Id.* at 12,314. Finally, the Final Rule does not require orphan nonattainment areas to submit maintenance plans under § 7505a, and deems the requirement for maintenance under § 7410(a)(1) to be satisfied by the area's approved Prevention of Significant Deterioration SIP. *Id.* at 12,302, 12,314.

(a) Environmental Petitioners argue that elimination of New Source Review and conformity in orphan nonattainment areas violates the anti-backsliding requirements. The EPA argues that the Final Rule lawfully lifts the requirement for New Source Review and conformity for orphan nonattainment areas because the 2008 NAAQS is more stringent than the 1997 NAAQS. According to the EPA, areas that have attained the 2008 NAAQS have necessarily attained the 1997 NAAQS.

This Court previously held that New Source Review is unambiguously a "control" under § 7502(e). *South Coast*, 472

F.3d at 901-02. Environmental Petitioners also contend that conformity is a "control" under § 7502(e). The EPA does not address general conformity requirements, but argues that our decision in *South Coast* does not require transportation conformity as an anti-backsliding control. According to the EPA, in *South Coast* we held that only existing motor vehicle emissions budgets are required anti-backsliding controls, not the conformity requirement itself.

The Final Rule provides that 1997 nonattainment areas are "no longer . . . required to demonstrate transportation conformity for the 1997" NAAQS after the 1997 NAAQS is revoked. 80 Fed. Reg. at 12,284. Pursuant to the Final Rule, "the latest approved or adequate emission budgets for a previous ozone NAAQS . . . would continue to be used in conformity determinations for the 2008 ozone NAAQS until emission budgets are established and found adequate or are approved for the 2008 ozone NAAQS." *Id.* But the Final Rule provides that areas "designated attainment for the 2008 ozone NAAQS are not subject to transportation or general conformity requirements regardless of their designation for the 1997 ozone NAAQS at the time of revocation of that NAAQS." *Id.* at 12,300.

The EPA is correct that *South Coast* held only that "one-hour conformity emissions budgets constitute 'controls' under section 172(e)." 472 F.3d at 904. Furthermore, on rehearing, we clarified that our decision with respect to conformity determinations "speaks only to the use of one-hour motor vehicle emissions budgets as part of eight-hour conformity determinations until eight-hour motor vehicle emissions budgets are available." *South Coast Air Quality Mgmt. Dist. v. EPA*, 489 F.3d 1245, 1248 (D.C. Cir. 2007). But our decision that emissions budgets constitute controls does not preclude that "conformity" requirements in general are controls.

Conformity requirements are designed to constrain ozone pollution as they have the "purpose of eliminating or reducing the severity and number of violations of the [NAAQS] and achieving expeditious attainment of such standards." 42 U.S.C. § 7506(c)(1)(A). Therefore, conformity requirements also are unambiguously "controls" under § 7502(e).

Although orphan nonattainment areas were originally designated attainment under the 2008 NAAQS, they have never been redesignated to attainment pursuant to § 7407(d)(3)(E) under the 1997 NAAQS. The EPA may not permit termination of New Source Review and conformity in the absence of formal redesignation under § 7407(d)(3)(E). *See Natural Res. Def. Council v. EPA*, 643 F.3d 311, 322-23 (D.C. Cir. 2011) (rejecting final rule that allowed attainment of the 1997 NAAQS to permit termination of the fees control for the one-hour NAAQS). As we stated in our prior *South Coast* opinion, "EPA is required by statute to keep in place measures intended to constrain ozone levels—even the ones that apply to outdated standards—in order to prevent backsliding." *South Coast*, 472 F.3d at 905. Accordingly, we grant Environmental Petitioners' petition and vacate the Final Rule as to the removal of New Source Review and conformity controls from orphan nonattainment areas.

(b) Environmental Petitioners argue that permitting states to shift other anti-backsliding requirements to contingency measures violates the Clean Air Act. The EPA responds that states must continue implementing all such measures in previously approved SIPs unless the EPA approves requests to amend SIPs to convert such requirements into contingency measures. For the same reasons that the EPA may not permit states to eliminate New Source Review and transportation conformity, the EPA also may not permit states to shift other anti-backsliding requirements to their list of contingency

measures without complying with the statutory requirements for redesignation. Therefore, we grant Environmental Petitioners' petition and vacate the Final Rule as to permitting states to move anti-backsliding requirements for orphan nonattainment areas to their list of contingency measures based on initial 2008 designations.

(c) Likewise, without requiring nonattainment areas to meet the requirements for reattainment under § 7407(d)(3)(E), the EPA improperly waived the requirement that states adopt outstanding applicable requirements for the revoked 1997 NAAQS. Therefore, we grant Environmental Petitioners' petition and vacate the Final Rule as to waiving the requirement that states adopt outstanding applicable requirements for the revoked 1997 NAAQS.

(d) Environmental Petitioners argue that the Final Rule impermissibly waives the maintenance requirements under § 7410(a)(1) for orphan nonattainment areas. The Final Rule allows approved Prevention of Significant Deterioration SIPs to satisfy the obligation to submit a maintenance plan under § 7410(a)(1). 80 Fed. Reg. at 12,302. Prevention of Significant Deterioration SIPs bar the construction of major sources of emissions without compliance with certain statutory requirements. *See* § 7475(a).

The Final Rule also does not require orphan nonattainment areas to submit a maintenance plan under § 7505a. 80 Fed. Reg. at 12,302. The EPA contends that there is no statutory requirement for a separate maintenance plan for orphan nonattainment areas. However, one of the five requirements for redesignation under § 7407(d)(3)(E) is that the EPA "approve[] a maintenance plan for the area as meeting the requirements of section 7505a of this title." § 7407(d)(3)(E)(iv). Therefore, the Final Rule is inconsistent

with the clear text of § 7407(d)(3)(E) in waiving the § 7505a(a) maintenance plan requirement for orphan nonattainment areas.

Environmental Petitioners also appear to contend that even with a § 7505a maintenance plan, the Final Rule would violate the maintenance requirement under § 7410(a)(1) because § 7410(a)(1) requires something more than a Prevention of Significant Deterioration SIP and a § 7505a maintenance plan. Specifically, Environmental Petitioners argue that a SIP for an orphan nonattainment area must include a plan to ensure that pollution from existing sources and new sources not subject to the PSD requirements does not cause those areas to fall into violation of the 2008 NAAQS. According to Environmental Petitioners, without such safeguards, existing measures have proved insufficient to provide for continuing attainment of the 2008 NAAQS.

Section 7410(a)(1) provides that SIPs must provide for "implementation, maintenance, and enforcement" of the NAAQS. The statute clearly requires "maintenance" provisions to be included in SIPs, but the statute does not require a separate SIP component entitled "maintenance plan." In fact, the statute provides no guidance for what SIPs must include in order to comply with the § 7410(a)(1) maintenance requirement beyond the criteria laid out in § 7410(a)(2). Environmental Petitioners do not allege the agency has eliminated § 7410(a)(2)'s requirements. Therefore, the Final Rule will be upheld so long as it is neither unreasonable nor arbitrary.

The EPA justified the rule by explaining that a § 7471 "PSD SIP, in conjunction with the other already-existing statutory and regulatory provisions . . . are generally sufficient to prevent backsliding, and to satisfy the requirement for maintenance under" § 7410(a)(1). 80 Fed. Reg. at 12,302.

According to the EPA, the "control measures implemented by these areas and included in their SIPs have already produced sufficient emissions reductions to achieve air quality that attained the 1997 ozone NAAQS, and resulted in an attainment designation for the more stringent 2008 ozone NAAQS." *Id.* The EPA therefore concluded that "the burden of developing an approvable [§ 7410(a)(1)] maintenance plan for the 2008 ozone NAAQS would outweigh any compensating benefit for an area that is already attaining that NAAQS and that is subject to prior nonattainment requirements which are already incorporated into the SIP and have been sufficient to bring the area into attainment of both the 1997 and 2008 standards." *Id.*

The EPA adequately explained why measures that achieved attainment of both the 1997 NAAQS and the 2008 NAAQS should be adequate to maintain the same 2008 NAAQS that has already been attained. The EPA also thoughtfully responded to comments that suggested the measures on which the EPA relies are insufficient to satisfy the § 7410(a)(1) maintenance requirement. Under these circumstances, the EPA's determination is neither unreasonable nor arbitrary.

Environmental Petitioners contend that the EPA has not addressed comments that identified examples of orphan nonattainment areas that purportedly were in fact not attaining the 2008 NAAQS. These comments were not raised in regard to the § 7410(a)(1) maintenance requirement. Instead, they appear to have been raised in response to other alleged shortcomings with the proposed rule. Moreover, the EPA appears to have addressed those arguments in its response to comments. Response to Comments on Implementation of the 2008 NAAQS for Ozone: SIP Requirements (Feb. 13, 2015) at 133. In any event, the comments are directed toward enforcement issues with the current NAAQS, not issues with

the underlying rule. Accordingly, the EPA's decision not to implement a separate § 7410(a) maintenance plan is neither arbitrary nor unreasonable.

Therefore, we grant Environmental Petitioners' petition and vacate the Final Rule with respect to the EPA's waiving of the § 7505a(a) maintenance plan requirement for orphan nonattainment areas, and we deny Environmental Petitioners' petition with respect to the § 7410(a)(1) maintenance requirement's application to orphan nonattainment areas in other respects.

## 2. Formal Redesignation

The second procedure by which areas designated nonattainment under the 1997 NAAQS may remove certain anti-backsliding requirements and shift other requirements from the active part of their SIPs to the contingency measures part involves areas designated nonattainment under both the 2008 NAAQS and the 1997 NAAQS. 80 Fed. Reg. at 12,303-04. The Final Rule allows states to seek formal redesignation to attainment based on the 2008 NAAQS with an approved maintenance plan that addresses the current and revoked NAAQS. *Id.* at 12,304. Under this procedure, states may terminate and remove any applicable anti-backsliding requirements, including New Source Review requirements, from the active part of their SIPs. *Id.*

The EPA properly subjected these areas to anti-backsliding requirements when the 1997 NAAQS was revoked because they were still in nonattainment at the time of revocation. *See* § 7502(e). The Act is ambiguous as to whether such areas must retain these anti-backsliding requirements after they are successfully redesignated as attainment areas under the 2008 NAAQS. Unlike orphan nonattainment areas, these areas

have met the statutory requirements for redesignation under § 7407(d)(3)(E). Therefore, these areas have shown, for example, that "the[ir] improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan." § 7407(d)(3)(E)(iii). Although these areas may not have been redesignated with respect to the 1997 NAAQS, by meeting the statutory requirements for redesignation with respect to the 2008 NAAQS, they necessarily also meet the less restrictive requirements for redesignation under the 1997 NAAQS. Accordingly, it is reasonable for these areas to shed their anti-backsliding controls by virtue of meeting the five statutory criteria for redesignation. Therefore, we deny Environmental Petitioners' petition with respect to this aspect of the Final Rule.

### 3. Redesignation Substitute

The third procedure by which areas designated nonattainment under the 1997 NAAQS may remove certain anti-backsliding requirements and shift other requirements from the active part of their SIPs to the contingency measures part also involves areas designated nonattainment under both the 2008 NAAQS and the 1997 NAAQS. This procedure allows states "to submit a redesignation substitute request for a revoked NAAQS." 80 Fed. Reg. at 12,304. The redesignation substitute request "is based on" the Clean Air Act's "criteria for redesignation to attainment" under § 7407(d)(3)(E), 80 Fed. Reg. at 12,305, but it does not require full compliance with all five conditions in § 7407(d)(3)(E). The Clean Air Act unambiguously requires nonattainment areas to satisfy all five of the conditions under § 7407(d)(3)(E) before they may shed controls associated with their nonattainment designation. The redesignation substitute lacks the following requirements of § 7407(d)(3)(E): (1) the EPA has "fully approved" the

§ 7410(k) implementation plan; (2) the area's maintenance plan satisfies all the requirements under § 7505a; and (3) the state has met all relevant § 7410 requirements. 80 Fed. Reg. at 12,305. Because the "redesignation substitute" does not include all five statutory requirements, it violates the Clean Air Act. Therefore, we grant Environmental Petitioners' petition and vacate the Final Rule as to the "redesignation substitute."

## C.  Baseline Year

The Clean Air Act measures Reasonable Further Progress by using a baseline year as the starting point. Nonattainment areas must reduce emissions of pollutants by fixed percentages compared to the pollutant level in a baseline year. 42 U.S.C. § 7511a(b)(1)(A), (B). The initial baseline year under the statute is 1990, *id.*, but the statute does not define baseline years for future NAAQS. In the Final Rule, the EPA defined the baseline year as 2011, which is the "calendar year for the most recently available triennial emission inventory at the time [rate-of-progress/reasonable further progress] plans are developed." 80 Fed. Reg. at 12,272. The Final Rule also allows states to select an alternative baseline year between 2008 and 2012 if they provide appropriate justification. *Id.*

Environmental Petitioners argue that this rule is unlawful because the Clean Air Act requires the baseline year to be the year of designation/classification, which in the case of the 2008 NAAQS is 2012. While an initial baseline year of 1990 is specified by statute, the Clean Air Act is silent regarding future baseline years. Therefore, this question is governed by *Chevron* step two. The Reasonable Further Progress requirement ensures that states make regular emissions reductions to achieve timely attainment. *See* § 7511a. To monitor their progress in achieving regular emissions reductions, states are required to prepare an emissions

inventory every three years. § 7511a(a)(3)(A). The EPA's selection of 2011 as the baseline year is reasonable because it is tied to the three-year statutory cycle for emissions inventories. *Id.* Therefore, we deny Environmental Petitioners' challenge to the setting of 2011 as the baseline year.

With respect to selection of an alternative baseline year between 2008 and 2012, the EPA has failed to provide a statutory justification. The "EPA must 'ground its reasons for action or inaction in the statute,' rather than on 'reasoning divorced from the statutory text.'" *Natural Res. Def. Council v. EPA* (*NRDC 2014*), 777 F.3d 456, 468 (D.C. Cir. 2014) (quoting *Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (2014)). The EPA based its creation of the alternative baseline year option on the convenience of allowing nonattainment areas to receive credit for emissions reduction measures adopted prior to the baseline year. Because the EPA has no statutory basis for the alternative baseline year provision, we grant Environmental Petitioners' petition and vacate the Final Rule as to the alternative baseline year option.

### D. Fifteen-Percent Rule

The Clean Air Act requires an area in a moderate or greater degree of nonattainment to reduce emissions of VOCs by fifteen percent within six years of the baseline year. 42 U.S.C. § 7511a(b)(1)(A). The Final Rule interprets this requirement as meaning that "an area that has already met the 15 percent requirement for VOC under either the 1-hour ozone NAAQS or the 1997 ozone NAAQS (for the first 6 years after the [reasonable further progress] baseline year for the prior ozone NAAQS) would not have to fulfill that requirement again." 80 Fed. Reg. at 12,271; *see also id.* at 12,276. The Environmental Petitioners argue that the rule is unlawful because the

interpretation allows areas to avoid actually achieving emissions reductions to satisfy the fifteen-percent requirement.

The Final Rule does not require nonattainment areas that have previously revised their SIPs to address the Clean Air Act's fifteen-percent requirement to revise their SIPs again. If an area fails to achieve this reduction according to their plan, a petitioner may file for injunctive relief or the EPA may pursue an enforcement action. Environmental Petitioners argue that the Final Rule allows nonattainment areas to omit the fifteen-percent requirement even if they never previously achieved a fifteen-percent reduction. The EPA has represented that the provision at issue in this case is the same as that at issue in *NRDC 2009*, 571 F.3d 1245. In *NRDC 2009*, the EPA rule allowed areas that had revised their SIPs to include a fifteen-percent VOC emissions reduction to not be subjected to a second fifteen-percent requirement under the new NAAQS. *Id.* at 1261. We held that "the EPA reasonably resolved a statutory ambiguity under step 2 of the framework set out in *Chevron*." *Id.* at 1262. We accept the EPA's representation that the fifteen-percent requirement in the Final Rule is the same as the provision at issue in *NRDC 2009*. Therefore, because the EPA's interpretation is permissible, we deny Environmental Petitioners' challenge to the fifteen-percent reduction plan waiver.

### E.   Area-Wide Emissions Reductions

The Clean Air Act requires nonattainment areas to achieve "such reductions in emissions from existing sources in the area" as can be achieved by the adoption of Reasonably Available Control Technology ("RACT"). 42 U.S.C. § 7502(c)(1). The Final Rule allows nonattainment areas to satisfy the $NO_x$ RACT requirement by using averaged area-wide emissions reductions. 80 Fed. Reg. at 12,278-79. Thus,

"states may demonstrate as part of their $NO_x$ RACT SIP submittal that the weighted average $NO_x$ emission rate from all sources in the nonattainment area subject to RACT meets $NO_x$ RACT requirements." *Id.* at 12,278. Environmental Petitioners argue that this rule violates the clear terms of the Clean Air Act, which require each individual source to meet the $NO_x$ RACT requirement.

They contend that § 7511a(b)(2) requires implementation of RACT with respect to "all" major sources, and "all" means "each one of." Section 7511a(b)(2) requires states to submit revisions to SIPs "to include provisions to require the implementation of reasonably available control technology under section 7502(c)(1) of this title with respect to each of" three specific categories of VOC sources, including "all . . . major stationary sources of VOCs that are located in the area." Pursuant to § 7511a(f), that plan provision applies to "major stationary sources" of $NO_x$. Section 7511a(b)(2) refers to "all" "major stationary sources" and requires implementation of RACT "with respect to" that entire category of sources. The statute does not specify that "each one of" the individual sources within the category of "all" "major sources" must implement RACT. Environmental Petitioners argue that the only reasonable dictionary definition of "all" when used with a plural noun (major stationary sources) is "each one of." Instead, when used to refer to a plural noun, the word "all" may express an aggregate and be defined as the "whole number or sum of." *Black's Law Dictionary* 74 (6th ed. 1990). This definition is consistent with the categorical approach taken by the EPA. In short, the plain language—in the context of the interrelationship between §§ 7511a(b)(2) and 7502(c)(1)— does not mandate RACT for each individual source.

Therefore, as discussed above, we cannot strike down the EPA's reasoned interpretation of the ambiguous term at

*Chevron* step one, *see* Section II, *supra*. We must instead uphold the EPA's interpretation, provided it is reasonable, under *Chevron* step two. *See Chevron*, 467 U.S. at 842-43.

We further note that § 7511a(b)(2) refers to § 7502(c)(1), which provides that SIP "provisions shall provide for the implementation of all reasonably available control measures as expeditiously as practicable (including such reductions in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology)." § 7502(c)(1). Section 7502(c)(1) does not require reductions from each individual major source. Instead, it requires "reductions in emissions from existing sources in the area," and other than mandating that implementation be as "expeditious[] as practicable," the section is ambiguous as to how areas are required to achieve those reductions.

The EPA's interpretation reasonably allows nonattainment areas to meet RACT-level emissions requirements through averaging within a nonattainment area. Therefore, we deny Environmental Petitioners' petition as to the EPA's construction of the RACT requirement.

### F. Waiving Requirements for Areas Designated Maintenance Under the 1997 NAAQS

Environmental Petitioners seek to have us invalidate several provisions of the Final Rule that apply to areas designated attainment for the 2008 NAAQS after being designated maintenance areas under the 1997 NAAQS ("orphan maintenance areas").

### 1.     Elimination of Transportation Conformity

As with orphan nonattainment areas, the Final Rule declares that orphan maintenance areas are "no longer . . . required to demonstrate transportation conformity for the 1997 ozone NAAQS after the 1997 ozone NAAQS is revoked." 80 Fed. Reg. at 12,284.  Environmental Petitioners argue that the elimination of transportation conformity in orphan maintenance areas violates the Clean Air Act.   Section 7506(c)(5) provides that conformity requirements apply to "(A) a nonattainment area and each pollutant for which the area is designated as a nonattainment area; and (B) an area that was designated as a nonattainment area but that was later redesignated . . . as an attainment area and that is required to develop a maintenance plan under section 7505a."

We previously explained that the EPA lacks the authority to revoke transportation conformity for orphan nonattainment areas.  *See* Section IV.B.1(a), *supra*.   The EPA argues that it is permitted to remove conformity requirements for orphan maintenance areas because such areas became attainment areas for the 1997 NAAQS prior to the date on which it was revoked.  As a result, the EPA argues that these areas are not subject to anti-backsliding requirements, so there is no statutory requirement that they maintain the transportation conformity requirement.  We disagree.

In contrast to nonattainment areas, which § 7506(c)(5) references by their status as "nonattainment area[s]," maintenance areas are referenced by previous events: "an area that *was* designated as a nonattainment area but that *was* later redesignated . . . as an attainment area and that is required to develop a maintenance plan under section 7505a." § 7506(c)(5) (emphases added).   Although the Final Rule

revoked the 1997 NAAQS, it cannot revoke the statutory status of orphan maintenance areas. Even after revocation of the 1997 NAAQS, an orphan maintenance area is "an area that *was* designated as a nonattainment area but that *was* later redesignated . . . as an attainment area."

It is irrelevant that this previous designation and redesignation occurred before the prior NAAQS was revoked because nothing in the Clean Air Act allows the EPA to waive this unambiguous statutory requirement. Moreover, the Act clearly contemplates new NAAQS being promulgated within ten years of an area's redesignation to attainment because the statute requires the EPA to review NAAQS every five years and to "promulgate such new standards as may be appropriate." § 7409(d)(1). Therefore, the revocation of the 1997 NAAQS does not waive the unambiguous mandate that conformity requirements apply to orphan maintenance areas. Accordingly, we grant Environmental Petitioners' petition as to the elimination of transportation conformity in orphan maintenance areas.

### 2. Section 7410(a)(1) Maintenance Planning Requirement

Environmental Petitioners contend that the Final Rule unlawfully waives the § 7410(a)(1) maintenance planning requirement for the 2008 NAAQS. 80 Fed. Reg. at 12,301. The Final Rule provides that an orphan maintenance area's § 7505a(a) maintenance plan for the revoked 1997 NAAQS and the state's approved Prevention of Significant Deterioration SIP satisfy the area's obligations for maintenance of the 2008 NAAQS under § 7410(a)(1) of the Clean Air Act. 80 Fed. Reg. at 12,301, 12,314. Environmental Petitioners argue the Prevention of Significant Deterioration SIP is the sole maintenance plan requirement for the 2008 NAAQS, and it

only addresses pollution from very large sources. According to Environmental Petitioners, the EPA has no statutory authority to waive the § 7410(a)(1) maintenance requirement.

The EPA justified its rule on the ground that orphan maintenance areas have already been redesignated to attainment for the 1997 NAAQS and designated attainment for the more stringent 2008 NAAQS. 80 Fed. Reg. at 12,301. According to the EPA, "[a]ny further [§ 7410(a)(1)] maintenance plan requirement under the 2008 . . . NAAQS would be unnecessarily burdensome." *Id.* Although the § 7505a(a) maintenance plans for orphan maintenance areas "were established for maintenance of the 1997 . . . NAAQS, . . . they also provide a foundation for maintenance of the 2008 . . . NAAQS, which, in combination with other active requirements for the 2008 ozone NAAQS, contribute to maintenance of the new standard." *Id.* The Final Rule explained that "no additional measures beyond the prior [§ 7505a(a)] maintenance plans and the PSD plans for the 2008 [NAAQS] should be necessary to provide for maintenance in those areas." *Id.*

We previously addressed the alleged waiver of the § 7410(a)(1) maintenance requirement with respect to orphan nonattainment areas. *See* Section IV.B.1(d), *supra*. As we explained, § 7410(a)(1) does not provide clear requirements as to what SIPs must include in order to comply with the § 7410(a)(1) maintenance requirement beyond the criteria laid out in § 7410(a)(2). As with orphan nonattainment areas, with respect to orphan maintenance areas, the EPA adequately explained why no additional measures beyond the § 7505a(a) maintenance plans and the Prevention of Significant Deterioration plans for the 2008 NAAQS are necessary to provide for maintenance of the 2008 NAAQS. Therefore, we deny Environmental Petitioners' petition with respect to the

§ 7410(a)(1) maintenance requirement's application to "orphan maintenance areas."

### 3. Elimination of Second Maintenance Plan

Environmental Petitioners challenge the Final Rule's elimination of the requirement that orphan maintenance areas prepare a second maintenance plan under § 7505a(b). 80 Fed. Reg. at 12,301. Section 7505a(b) provides that "8 years after redesignation of any area as an attainment area," states "shall submit . . . an additional revision of the" maintenance plan "for 10 years after the expiration of the 10-year period referred to in subsection (a)." The EPA argues that the requirement for a second 10-year maintenance plan is based on an area's designation status under an operative NAAQS. When the 1997 NAAQS was revoked, the orphan maintenance areas' designations as maintenance under the 1997 NAAQS were revoked as well.

The statutory requirement for a second maintenance plan is unambiguous. § 7505a(b). And the Clean Air Act clearly contemplates new NAAQS being promulgated within eight years of an area's redesignation to attainment because the statute requires the EPA to review NAAQS every five years and to "promulgate such new standards as may be appropriate." § 7409(d)(1). Therefore, the revocation of the old NAAQS does not waive the unambiguous requirement for second maintenance plans under § 7505a(b). Accordingly, we grant Environmental Petitioners' petition and vacate the Final Rule provision waiving the second 10-year maintenance plan for "orphan maintenance areas."

**V.      Conclusion**

For the reasons set forth above, we deny South Coast's petition for review and grant in part and deny in part the Environmental Petitioners' petition.  Specifically, we grant Environmental Petitioners' petition and vacate as to (1) waiver of the statutory attainment deadlines associated with the 1997 NAAQS; (2) removal of New Source Review and conformity controls from orphan nonattainment areas; (3) grant of permission to states to move anti-backsliding requirements for orphan nonattainment areas to their list of contingency measures based on initial 2008 designations; (4) waiver of the requirement that states adopt outstanding applicable requirements for the revoked 1997 NAAQS; (5) waiver of the § 7505a(a) maintenance plan requirement for orphan nonattainment areas; (6) creation of the "redesignation substitute"; (7) creation of an alternative baseline year option; (8) elimination of transportation conformity in orphan maintenance areas; and (9) waiver of the requirement for a second 10-year maintenance plan for orphan maintenance areas.  In all other respects, Environmental Petitioners' petition is denied.

*So ordered.*